IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

SHULER DRILLING COMPANY, INC.
                                                                                                           PLAINTIFF

V.                              Case No. 11-CV-1049

SOUTHERN MANAGEMENT SERVICES, INC.                    DEFENDANT

V.

SUPERIOR WELL DRILLING, LLC                    THIRD PARTY DEFENDANT

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Before the Court is a complaint filed by Shuler Drilling Company, Inc. ("Shuler") against Southern Management Services, Inc. ("Southern") claiming that Southern owes Shuler for services that it performed. ECF No. 3. Also before the Court is a counterclaim and third-party complaint filed by Southern. ECF No. 22. In its third-party complaint, Southern seeks a $1,000,000 judgment against Superior Well Drilling, LLC ("Superior") for the alleged unauthorized purchase of certain drilling rig components. Southern alleges in its counterclaim against Shuler that Superior is the alter ego of Shuler, and Southern seeks a set-off in the amount of $1,000,000 against Shuler's unpaid invoices.

On September 29, 2014, the Court held a bench trial to address the parties' claims. As requested by the Court, the parties filed post-trial briefs. ECF Nos. 42 and 43. After review of the record and evidence presented at trial, the Court makes the following findings of fact and conclusions of law.[1]

---

[1]The Court notes that the filings in this case consist mostly of facts. The complaints contain only facts and no citations to the law. At trial, no party discussed any legal bases for its factual claims.

# I. FINDINGS OF FACT

This case revolves around the complicated and poorly documented business dealings of three separate entities: Shuler;[2] Southern;[3] and Superior.[4]  Any agreements between the parties dealing with the disputes at issue in this case are oral agreements or contracts.  There are no written contracts at issue.  The parties worked together on several projects during a certain time period, and some of these projects have given rise to three specific disputes.  The Court's findings of fact regarding each dispute are as follows:

**A. Unpaid Invoices for Services Rendered by Shuler (Shuler v. Southern and Southern's Counterclaim)**

1. In 2008 and 2009 Shuler and Southern agreed that Shuler would be the operator of certain oil wells for Southern.[5]  As the operator of the wells, it was Shuler's job to obtain third parties to provide services for the wells.  Southern agreed to reimburse Shuler for the operating expenses.

2. Shuler paid these third parties $906,451.17 for various services.  Shuler submitted invoices for these services to Southern, and Southern has not paid these invoices.

3. Southern admits that it owes Shuler for the services performed on the wells.  Southern, however, refuses to pay Shuler because of unresolved issues in an unrelated business matter in which Southern claims that Superior owes it $1 million.  Southern argues that Shuler and Superior are

---

[2]Shuler Drilling Company, Inc., is an Arkansas corporation, and Paula Reynolds is the sole stockholder.  Robert Reynolds is the President of Shuler Drilling Company.

[3]Southern Management Services, Inc., is a Texas corporation, and Teresa Disiere is the sole stockholder.  David Disiere is the President of Southern Management Services.

[4]Superior Well Drilling, LLC, is an Arkansas corporation, and Robert Reynolds owns an interest in Superior Well Drilling.

[5]These wells are known as Archie Armstrong #1 (located in Arkansas), J.H. Montgomery #1 (located in Louisiana), and Cedar Bluff #1 (located in Louisiana), and Dumas #1.

acting as one business operation, and therefore Southern is entitled to a $1 million setoff against the amount that it owes Shuler for unpaid invoices. Southern's reason for refusing to pay the unpaid invoices is the subject matter of its counterclaim against Shuler.

4. One issue that all parties agree on involves the Dumas #1 well. When Shuler filed its lawsuit against Southern, a *lis pendens* was filed on the production of Dumas #1. This well has now been plugged and abandoned. Lion Oil is holding $60,409.86 for Southern for oil runs on Dumas #1. Southern owes Shuler $53,672.45 for operating and plugging expenses related to Dumas #1. The parties agree that the money being held by Lion Oil should be disbursed as follows: $53,672.45 to Shuler and $6,737.41 to Southern.

**B.   1,000 Horsepower Drilling Rig (Southern v. Superior)**

5. In November 2008, at a meeting in Dallas, Texas, Loadcraft Industries ("Loadcraft")[6], Superior, and Southern agreed to build a 1,000 horsepower drilling rig. Ownership in the rig would be as follows: Superior 50%, Loadcraft 25%, and Southern 25%. Loadcraft agreed to supply certain equipment. Southern agreed to pay an initial payment of $1,000,000 to be used to purchase needed equipment. Southern also agreed to contribute more money (not to exceed $1 million) as needed to purchase necessary equipment. Superior was to supply the labor needed to assemble the rig and commission it.

6. On December 3, 2008, Southern sent $1,000,000 to Superior. Superior purchased the following equipment with the money: two Weatherford pumps ($311,750), 10,000 feet of drill pipe ($550,000); twenty drill collars ($100,000); and a hex kelly ($15,000). Superior incurred a trucking

---

[6]Loadcraft Industries is not a party to this action.

fee expense of $5,632 associated with the purchase of the equipment. This equipment was delivered to Superior.

7. Superior requested a second payment of $1,000,000 from Southern to buy necessary equipment for the drilling rig. Southern did not provide the second payment, and the 1,000 horsepower drilling rig was never completed.

8. When it was apparent that the drilling rig would not be completed, Loadcraft went to Superior and took possession of the equipment that Loadcraft had contributed to the project. Southern has not taken possession of the equipment that Superior bought with Southern's contribution and instead asserts that it is entitled to a refund of its $1,000,000 contribution to the building of the 1,000 horsepower drilling rig.

9. At some pont, Superior brought the equipment it bought with Southern's contribution to Hampton, Arkansas. Superior, however, can presently account for only some of the equipment, the Weatherford pumps and the drill pipe. Superior cannot locate the twenty drill collars or the hex kelly.

### C.  2,000 Horsepower Drilling Rig (Southern v. Superior)

10. In November 2008, Southern agreed to purchase a 2,000 horsepower drilling rig from Loadcraft Industries, Ltd. ("Loadcraft") for $22,875,000. Southern hired Superior to oversee the assembly of the drilling rig and operate it once it began to drill. Superior agreed to reimburse Southern its costs to commission the 2,000 horsepower drilling rig. Once Southern recovered its investment in the drilling rig, Superior and Southern agreed to evenly split the profits from the drilling operations.

11. Southern conveyed to Superior that it was imperative that the drilling rig begin to drill no later than December 31, 2008, so that Southern could take accelerated depreciation of up to 50% of the cost of the equipment.

12. Superior sent employees from Hampton, Arkansas to Brady, Texas to work on the drilling rig. Disiere, the president of Southern, personally observed the Hampton employees working in Brady. Superior completed the drilling rig on time, and it was operational before December 31, 2008. Southern, however, claims that it did not authorize Superior to send employees from Hampton to Brady.

13. On December 17, 2008, Superior sent an invoice to Southern that contained the expenses related to the Hampton crew being sent to Brady. On January 28, 2009, Southern made a $200,000 payment on this invoice, which left a balance of $27,375.38. On May 24, 2009, Superior made an adjustment to the invoice and credited Southern for $26,608.07. Superior testified that it considers this invoice paid in full. Southern now seeks a refund from Superior for all expenses related to the Hampton crew working in Brady. Southern, however, never objected to these expenses contained in the invoice until some time in 2012, after Shuler filed a lawsuit against Southern.

14. This same invoice billed Southern for two 2008 Ford F-150 trucks intended to be part of the 2,000 horsepower drilling rig. There is no dispute that Southern has paid for these trucks. The trucks, however, are presently in the possession of Superior. Superior agrees that Southern should be awarded an amount equal to the cost of the two F-150 trucks, which is $36,438.29.

## II. CONCLUSIONS OF LAW

The Court now sets forth its conclusions of law related to each dispute:

**A. Unpaid Invoices for Services Rendered by Shuler (Shuler v. Southern and Southern's Counterclaim)**

1. Both Shuler and Southern agree that Arkansas law governs the agreement regarding the operation of certain oil wells. Southern does not dispute that it owes Shuler $906,451.17 for services rendered pursuant to the agreement. Southern, however, argues that Superior and Shuler are one business entity and that Southern is entitled to a $1 million setoff against the Shuler invoices.

2. Southern argues that Rob Reynolds, as both the President of Shuler[7] and a shareholder of Superior,[8] did not separate his business interests from each other. Southern asks the Court to treat Shuler and Southern as one, allowing Southern a $1 million setoff against the Shuler invoices.

3. Corporations are separate and distinct legal entities. *Yammar Co., Ltd. v. Slater*, 2012 Ark. 36, at *18, 386 S.W.3d 439, 450 (Ark. 2012) (citing *Mannon v. R.A. Young & Sons Coal Co.*, 207 Ark. 98, 179 S.W.2d 457 (Ark. 1944)). "'The fact that the officers of one corporation are also officers of another does not make the corporations the same, nor the acts of one the acts of the other.'" *Id* (citing *Mannon v. R.A. Young & Sons Coal Co.*, 207 Ark. 98, 179 S.W.2d 457 (Ark. 1944)). Further, "'[t]he fact that some of the stockholders in one company had also stock in each of the other companies, and the fact that the general managers and officers of one company were also general managers and officers of another company, did not make these companies the same corporation, nor the acts of one the acts of the other.'" *Id*. (citing *Fort Smith Light & Traction Co. v. Kelley*, 94 Ark. 461, 127 S.W. 975 (Ark. 1910)).

---

[7] Reynolds does not own stock in Shuler. Paula Reynolds owns 100% of the Shuler stock.

[8] Reynolds owned 33% of the interest in Superior when this lawsuit was filed, and he currently owns 50%.

4. Disiere testified that he viewed Shuler and Southern as the same and that Reynolds never disclosed the nature of his role in each business. Other than Disiere's testimony about what he believed to be the relationship between the businesses, there is simply no evidence in the record to support Southern's argument that Shuler and Superior are alter egos and that the acts of one should be imputed to the acts of the other. Further, the only document in evidence that relates to this point discredits Disiere's testimony regarding what he knew about Reynolds's role at Superior. On August 25, 2005, Reynolds sent Disiere a letter on Shuler letterhead disclosing that Reynolds owned a one-third equity interest in Superior.

5. Because the Court finds that Shuler and Superior are separate and distinct legal entities. Southern is not entitled to a $ 1 million setoff against the Shuler invoices.

### B.  1,000 Horsepower Drilling Rig (Southern v. Superior)

6. The parties agree that Southern, Superior, and Loadcraft formed a partnership to commission a 1,000 horsepower drilling rig. The Court, however, must determine which state's law applies to these circumstances. In cases involving contracts, courts apply the law from the state that has the most significant relationship to the case. *Scottsdale Ins. Co. v. Morrowland Valley Co., LLC*, 2012 Ark. 247, at *6, 411 S.W.3d 184, 189 (Ark. 2012). Courts look to the following five factors to determine which state has the most significant relationship to a particular case: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; [and] (5) the domicile, residency, nationality, place of incorporation and place of business of the parties." *Id*. Here, all negotiations were conducted in Dallas, Texas, and Texas is the principal place of business for both Loadcraft and Southern. On the other hand, Arkansas is Superior's principal place of business and the drilling rig was to be

assembled in Arkansas. From these facts, however, the Court concludes that Texas has the most significant relationship to this case, and thus Texas law applies.

7. Southern claims that Superior breached its fiduciary obligations to Southern by mishandling Southern's $1 million contribution to buy equipment. Under Texas law, partners owe the following fiduciary duties to each other: (1) to fully disclose all matters affecting the partnership; (2) to account for all partnership profits and property; and (3) to refrain from competition with the partnership. *Hawthorne v. Guenther*, 917 S.W.2d 924 (Tex. App. 1996).

8. Southern claims that Superior breached its fiduciary obligations by using Southern's $1 million contribution to buy unauthorized equipment. Disiere testified that he did not approve any of the equipment purchases by Superior and that he never asked Superior what equipment it intended to buy with the money. Disiere further testified that he did not need to know about the equipment and that there was no need to tell him because he was not the right person to be selecting equipment. Instead, he stated that he exclusively relied upon the expertise and judgment of Rob Reynolds to select what equipment to purchase.

9. There is no evidence in this case that Superior purchased the wrong equipment or purchased poor quality equipment. Disiere approved of the fact that his contribution was going to Superior to be used to buy equipment. There was no reason for Superior to seek Disiere's approval for specific equipment given that Disiere testified that he did not need to know and that he trusted Superior and Rob Reynolds to select the equipment.

10. Southern also claims that Superior breached its fiduciary duty by not being able to account for all partnership property. The Court agrees with Southern on this point. Superior admits that it cannot account for the twenty drill collars and a hex kelly that it purchased with Southern's

$1 million contribution. Superior further admits that it once had possession of the equipment but cannot presently locate it.

11. All parties agreed to contribute resources to this partnership. Superior worked on the construction of the rig, contributing time and labor to the partnership until the deal fell through. After the deal fell through, Loadcraft took possession of the equipment that it had contributed to the partnership. The Court concludes that the proper and equitable remedy under these circumstances is for Southern to do the same with the equipment that was purchased with its contribution. For any equipment not accounted for, Superior must pay Southern the value of the missing equipment.

### C. 2,000 Horsepower Drilling Rig (Southern v. Superior)

12. Southern seeks reimbursement from Superior for monies paid to Superior for the construction and commissioning of a 2,000 horsepower drilling rig. Specifically, Southern asserts that it never authorized any expenses associated with Superior sending employees from Hampton, Arkansas, to Brady, Texas, to work on the drilling rig. These expenses totaled approximately $200,000.

13. Southern cites no law in support of its argument that it should be reimbursed for the labor expenses associated with the Hampton crew working in Brady. Southern does not reference these particular expenses in its complaint or post-trial brief. This issue came to the Court's attention at the bench trial where Disiere testified that he never authorized the expenses. There is no evidence that the oral agreement between Southern and Superior required that Disiere authorize all expenses. Disiere simply argues that he should not have to pay the invoices associated with the expenses because he did not authorize them.

14. Southern has not proven that it is entitled to a refund from Superior for any unauthorized expenses associated with the Hampton crew working in Brady. Southern's complaint never even mentions the labor expenses associated with Superior employees traveling from Hampton to Brady to work on the drilling rig. Although the topic came up at trial, Southern's post-trial brief fails to mention these allegedly unauthorized expenses. Nowhere in the record does Southern cite to any law in support of its arguments relating to these expenses. Furthermore, Southern gives no legal basis for its argument that Superior was required to seek Disiere's authorization for all expenses related to constructing the drilling rig. In fact, the evidence shows that Disiere observed the Hampton crew working in Brady, paid the invoices associated with these expenses, and did not object to the expenses until some time after Shuler filed a lawsuit against Southern. Moreover, these expenses were reasonable considering that the drilling rig had to be fully operational by December 31, 2008. Southern benefitted from the labor of these Hampton employees because their work insured that the drilling rig was finished by Southern's deadline.

15. In its complaint, however, Southern does mention that it paid for two Ford F-150 trucks that Superior purchased in connection with commissioning the 2,000 horsepower drilling rig. These trucks are presently in Superior's possession, and Superior has agreed to pay Southern the purchase price for these two trucks. The combined purchase price of the two trucks is $36,438.29, and this amount is undisputed by the parties.

### III. CONCLUSION

Based upon the above findings of fact and conclusions of law, the Court finds that:

1. Lion Oil should disburse the $60,409.86 that it is holding for Southern as follows: $53,672.45 to Shuler and $6,737.41 to Southern.

2. Shuler should be awarded a judgment in the amount of $906,451.17 against Southern, which represents the total amount of unpaid invoices.[9]

3. Southern should be awarded a judgment in the amount of $151,439.29 against Superior, which represents the cost of two 2008 Ford F-150 trucks, twenty drill collars, and a hex kelly. Southern should be awarded possession of the following equipment purchased with Southern's $1 million contribution: two Weatherford pumps and 10,000 feet of drill pipe.

A judgment of even date consistent with this opinion shall issue.

**IT IS SO ORDERED**, this 25th day of November, 2014.

/s/ Susan O. Hickey<br>
Susan O. Hickey<br>
United States District Judge

---

[9] In its post-trial brief, Shuler asks the Court to award it prejudgment interest in the amount of $291,753.11, costs, and attorney's fees. Shuler may file a separate motion setting forth the authority for its arguments that it is entitled to prejudgment interest, costs, and attorney's fees.